Alan Godfrey **LEE,** on his own behalf and on behalf of those other Underwriters at Lloyd's, London, etc., et al., Plaintiffs,

v.

**INTERSTATE FIRE & CASUALTY COMPANY,** an Illinois corporation, Defendant.

No. 91 C 1732.

United States District Court, N.D. Illinois, E.D.

July 6, 1993.

Richard Fred Johnson, Lord, Bissell & Brook, Chicago, IL, for plaintiffs.

Victor J. Piekarski, Ellyn Beth Dorf, Querrey & Harrow, Ltd., Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

This action between plaintiffs Alan Godfrey Lee, Excess Insurance Co., Ltd., Yasuda Fire & Marine Insurance Co. (U.K.), Ltd., Terra–Nova Insurance Co., Ltd. and Centennial Insurance Co. (hereinafter "Underwriters") and defendant Interstate Fire & Casualty Co. ("Interstate") arises out of a settlement of a lawsuit by a minor, John Doe, against the Diocese of Providence, Rhode Island ("Diocese"), alleging sexual abuse of Doe by one Father William O'Connell. Following the settlement Interstate demanded that the Underwriters contribute their share of the Diocese's self-insurance limit. Claiming that the abuse of John Doe spanned two policy periods, Interstate demanded $200,000 from the Diocese and Underwriters. After paying this amount Underwriters and the Diocese filed this declaratory judgment action seeking reimbursement of $100,000.[1] Plaintiffs moved for summary judgment and defendant followed with a cross-motion for summary judgment. For the reasons stated, we deny plaintiffs' motion for summary judgment and deny defendant's cross-motion for summary judgment.

## FACTS

With the exception of Centennial Insurance, the Underwriters are citizens of the United Kingdom, with their principal place of business in the United Kingdom. Centennial is a citizen of New York, with its principal place of business in New York. Interstate is an Illinois corporation with its principal place of business in Illinois. Thus the court has jurisdiction under 28 U.S.C. § 1332(a)(2), diversity-of-citizenship. For the purposes of this action, the relevant facts are undisputed.

### The Insurance Contract

The insurance plan for the Diocese for the periods of July 1, 1983 to July 1, 1985, consisted of three tiers, totaling $5,000,000. The Diocese was self-insuring for the first $100,-000 ultimate net loss per occurrence. Underwriters provided coverage for the second level, an additional $100,000 ultimate net loss per occurrence. Interstate provided the third tier of insurance, an additional $4,800,-000.

This case revolves around the liability of Underwriters and Interstate to pay for injuries incurred by a minor due to the actions of Father O'Connell. The relevant clauses in the policy between Underwriters and the Diocese[2] concern the liability of Underwriters and Interstate as follows:

> Underwriters hereby agree ... to indemnify the [Diocese] for all sums which the [Diocese] shall be obligated to pay by reason of the liability imposed upon the [Diocese] by law ... for damages ... on account of personal injuries ... arising out of any occurrence happening during the period of the Insurance.

The term "occurrence" was defined in the policies as follows:

> The term 'occurrence' whenever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

### The Underlying Lawsuit and Settlement

The parties agree that Father O'Connell's sexual abuse of John Doe began in July 1983 and continued through December 1984 or February 1985. These incidents of abuse occurred in Bristol, Providence County and South Kingston, Washington County, Rhode Island. On January 6, 1986, John Doe, through his mother, filed suit in Rhode Island Superior Court against Father O'Connell and the Bishop and Auxiliary Bishop of

---

1. This court entered an order dismissing the Diocese from this action following a settlement between the Diocese and Interstate.

2. Although these clauses were used in the policies between Underwriters and the Diocese, Interstate adopted the language of the underlying policies, including these clauses.

the Diocese.[3] The parties to this sexual abuse action settled that case for a lump sum payment and an annuity from Interstate.[4] Interstate then demanded that the Diocese and the Underwriters each contribute two self-insurance payments because the abuse spanned two policy periods. The Diocese and Underwriters paid Interstate $200,000 for two policy periods, reserving their right to recover $100,000 each, claiming that the abuse of John Doe constituted only one occurrence, as defined by their insurance policy with the Diocese.

## DISCUSSION

We will grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir.1990). As we stated above, the parties agree on the facts relevant to this motion and the issue which we must decide is solely a matter of law—whether the sexual abuse constituted one or two occurrences under the insurance contract between the Underwriters and the Diocese. Before answering this question, however, we first must determine which law applies to this case.

### I. *Choice of Law*

■ Plaintiffs argue that Rhode Island law applies to the interpretation of the insurance contract in this case, while defendant contends that the court must apply Illinois substantive contract law. Because there is diversity of citizenship this court must apply Illinois law, including in the first instance Illinois choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg and Feldman Fine Arts, Inc.*, 917 F.2d 278, 286 (7th Cir.1990).

Plaintiffs contend that the law of the state where the insurance contract was issued or delivered should control. Defendant argues that the determining factor is where the contract was issued and countersigned. Unfortunately, neither party cites any decision of the Illinois Supreme Court, the controlling authority on this issue.

■ The most recent Illinois Supreme Court decision on choice of law in a contract case holds that where a contract is to be performed in various states, the state of contracting determines the law the court must apply to the case. *See Oakes v. Chicago Brick Co.*, 388 Ill. 474, 58 N.E.2d 460, 462 (1944). However, following the adoption by Illinois of the "most significant contacts" test for tort cases in *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970), the Illinois appellate court started to apply this same test to contract cases. *See Champagnie v. W.E. O'Neil Construction Co.*, 77 Ill.App.3d 136, 32 Ill.Dec. 609, 614–16, 395 N.E.2d 990, 995–97 (1979). This trend continued in other substantive contract cases, *see e.g., Purcell and Wardrope v. Hertz Corp.*, 175 Ill.App.3d 1069, 125 Ill.Dec. 585, 592, 530 N.E.2d 994, 1001 (1988); *Boise Cascade Home & Land Corp. v. Utilities, Inc.*, 127 Ill.App.3d 4, 82 Ill.Dec. 180, 186–87, 468 N.E.2d 442, 448–49 (1984), as well as *forum non conveniens* cases involving contracts. *See Certain Underwriters at Lloyd's London*, 238 Ill.App.3d 692, 179 Ill.Dec. 709, 714, 606 N.E.2d 541, 546 (1992); *Illinois Tool Works v. Sierracin Corp.*, 134 Ill.App.3d 63, 89 Ill.Dec. 40, 44–45, 479 N.E.2d 1046, 1050–51 (1985). The holding of these cases is in line with the Restatement (Second) of Conflict of Laws and several of these decisions cited § 188 of the Restatement. *See Illinois Tool Works*, 89 Ill. Dec. at 44–45, 479 N.E.2d at 1050–51; *Champagnie*, 32 Ill.Dec. at 615, 395 N.E.2d at 996.

Unfortunately, the appellate court has occasionally stated a choice of law rule different from the most significant contacts test. For example, in *Jadczak v. Modern Service Ins. Co.*, 151 Ill.App.3d 589, 104 Ill.Dec. 932,

---

**3.** This was followed by a six count amended complaint in July, 1987. Doe and his mother sued Father O'Connell for assault and battery, intentional infliction of emotional distress and loss of consortium. They sued the Bishop and Auxiliary Bishop of Providence for negligence, intentional infliction of emotional distress and as respondent superior for the conduct of Father O'Connell.

**4.** The settlement released all parties to the Rhode Island civil action.

935, 503 N.E.2d 794, 797 (1987), the court stated that the law of the state where the insurance policy was delivered or issued, or the place of the last act to give rise to a valid contract, controls. *Accord U.S. Fire Ins. Co. v. CNA Ins. Cos.*, 213 Ill.App.3d 568, 157 Ill.Dec. 660, 663–64, 572 N.E.2d 1124, 1127–28 (1991). This statement in *Jadczak*, however, is *dicta* because the *Jadczak* court's decision to apply Illinois law was based on the fact that the parties did not argue that any other law applied to the issues in question. *Jadczak*, 104 Ill.Dec. at 935, 503 N.E.2d at 797.[5]

Furthermore, *Jadczak* cites a more recent decision of the Illinois Supreme Court which tends to support the argument that the Supreme Court would hold that Illinois follows the most significant contacts test. *Id.* In *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 322 N.E.2d 454 (1975), the Illinois Supreme Court stated that Illinois choice of law rules consider

> the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the general contract.

*Id.* 322 N.E.2d at 457–58.

Although this statement is *dicta* because the court held that it should honor the explicit choice of law in the insurance contract, we believe *Hofeld* provides strong evidence that Illinois law has changed since *Oakes*. In fact, the Illinois Supreme Court referred to the comments to § 192 of the Restatement (Second) of Conflict of Laws, applicable to insurance policies. *See id.*, 322 N.E.2d at 458.

Although this court must predict how the Illinois Supreme Court would rule on this issue, we also must consider the recent decisions of our court of appeals. The Seventh Circuit has held that it believes that "Illinois law calls for the use of the most significant contacts rule in all choice of law disputes involving contracts". *Palmer v. Beverly En-*

*terprises*, 823 F.2d 1105, 1109 (7th Cir.1987); *see Florida Risk Planning Consultants, Inc. v. Transport Life Ins. Co.*, 732 F.2d 593, 595–96 (7th Cir.1984). The *Palmer* court engaged in an extensive review of Illinois decisions on the issue and reaffirmed its interpretation of Illinois law first stated in *Florida Risk Planning*. *See Palmer*, 823 F.2d at 1107–09.[6]

Based on what we perceive as the trend in the Illinois Appellate Court, the Supreme Court's *dicta* in *Hofeld* and the Seventh Circuit's interpretation of Illinois law, we believe that the Illinois Supreme Court would support the most significant contacts test for the choice of law rule in contract cases. We now turn to applying that rule to this case.

▪ In *Hofeld*, the Illinois Supreme Court identified the factors which we must consider to determine which state has the most significant contacts. *Accord Palmer*, 823 F.2d at 1109–10. Unfortunately, the parties have not identified all these factors in their Local Rule 12(M) statements and we must look at the record to answer certain of these questions. In this case the "location of the subject matter" of the insurance policy, the Diocese, is located in Rhode Island. The insured is domiciled in Rhode Island, the plaintiffs are domiciled in the United Kingdom and New York, and the defendant is domiciled in Illinois. Both the Underwriters and the Interstate policies were countersigned in Illinois, which apparently was the last act to give rise to the contract and the policies were delivered to the Diocese in Rhode Island. Neither party provided any information on the location of the contract negotiations.

The parties are domiciled in different states and, in fact, in different countries. Consequently, the weight of this factor should be minor. *See Trademasters Int'l, Inc. v. Borer*, 687 F.Supp. 434, 436 (N.D.Ill. 1988). Other than Illinois being the domicile of the defendant Interstate, Illinois' only other relationship to the transaction is that the insurance contracts were countersigned in Illinois. Rhode Island, on the other hand, appears to be the state with the greatest

---

**5.** Neither *U.S. Fire* nor *Jadczak* cited the Restatement. *U.S. Fire* cites only *Jadczak*.

**6.** *Palmer* never discussed *Hofeld*.

interest. The insured Diocese is located there, the acts or omissions which the insurance policies cover occurred there, and the insurance policies were delivered to Rhode Island. We believe that these factors outweigh the Illinois contacts and hold that Rhode Island law applies to the interpretation of the contracts in question.

## II. *Contract Interpretation*

■ Under Rhode Island law a court interpreting an insurance policy must attempt to determine the intent of the parties to that policy and, if practical, give effect to that intent. *See Nagy v. Lumbermens Mutual Cas. Co.,* 100 R.I. 734, 219 A.2d 396, 398 (1966). If terms of the policy are clear and unambiguous, the court must enforce the contract as written and may not engage in any further judicial construction. *See Brown v. Travelers Ins. Co.,* 610 A.2d 127, 128 (R.I. 1992); *Amica Mutual Ins. Co. v. Streicker,* 583 A.2d 550, 551 (R.I.1990). If, however, a court determines that terms in the insurance policy are ambiguous, the court may construe the meaning of those terms. *Amica,* 583 A.2d at 551–52. To determine whether in fact terms of the insurance policy are ambiguous, a court must look at the entire policy and interpret terms according to their plain or ordinary meaning. *Amica,* 583 A.2d at 552. Although a court should not stretch the meaning of terms to find an ambiguity, where the terms of the insurance policy are capable of more than one reasonable interpretation or are ambiguous, a court will strictly construe the contract against the insurer. *Bartlett v. Amica Mutual Ins. Co.,* 593 A.2d 45, 47 (R.I.1991); *Mullins v. Federal Dairy Co.,* 568 A.2d 759, 762 (R.I.1990).

■ The question facing this court is the interpretation of the term "occurrence," in the insurance policy. The parties disagree about the interpretation of occurrence applied to the facts of this case. However, the fact that Underwriters and Interstate dis-

agree about the meaning of the term "occurrence," does not render that term ambiguous.[7] Unfortunately, there is no direct precedent of the Rhode Island Supreme Court on this issue. Consequently, we look to rulings of other courts to provide guidance on how the Rhode Island Supreme Court would decide the legal issue in this case. *See Mullins,* 568 A.2d at 763 ("consideration of case law from other jurisdictions is helpful").

### A. *Did the Abuse Spanning Two Policy Periods Constitute Two Occurrences?*

■ Underwriters cite to several cases, including three cases involving child molestation, to support the position that a single occurrence begins at the time of the first encounter. The first case to apply the "first encounter rule" to such cases was *Interstate Fire & Casualty Co. v. Archdiocese of Portland,* 747 F.Supp. 618 (D.Or.1990). The *Interstate* court, applying Oregon law, adopted the "cause theory" to determine that the sexual abuse in that case constituted one occurrence.[8] Under this theory the court must determine "whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage...." *Id.* at 622. The *Interstate* court concluded that the one cause of the child's injury was the decision of the defendant archdiocese to hire the priest, or its failure to supervise him properly or remove him. *Id.* at 624. The court concluded:

> Although this negligence was present in each of the policy years at issue, it was continuous negligence, and not a number of discrete episodes of negligence. This continuous negligence was the single proximate cause of the resulting injury to Grgich and constitutes a single occurrence under the terms of both the policies....

*Id.* at 625.

The court went on to hold that the time of the one occurrence was set based on when

---

7. Both parties contend that the unambiguous language of the favors their interpretation of the contract.

8. The *Interstate* court cited no Oregon cases to support its application of the "cause theory". The court stated that the "cause theory" was the

majority view. *Interstate,* 747 F.Supp. at 622. Additionally, although the court stated that ambiguous language must be resolved against the insurance company, it never determined whether the meaning of the word occurrence in the policies at issue was ambiguous.

the injury due to the occurrence took place. *Id.*[9]

*Interstate* was followed by *The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. v. Arthur J. Gallagher & Co.,* Civil Action No. 88–0289 (W.D.La. May 2, 1991). The *Diocese of Lafayette* court followed the well-reasoned *Interstate* decision characterizing separate acts of molestation as a continuation of the original abuse due to exposure to the same general conditions which precipitated the first occurrence. The court went on to adopt the first encounter rule and found, under Louisiana law, that the injuries to the children occurred at the time of the first act of abuse. *Id.* at 3–4. The *Diocese of Lafayette* court rejected the exposure theory which courts apply in asbestos-related cases. While the exposure theory may be appropriate in such cases where it is difficult or impossible to identify when the injury occurs, the court stated that in child abuse case situations it is clear that injury to the child occurs at the time of the first encounter.

Underwriters also relies on *May v. Maryland Casualty Corp.,* 792 F.Supp. 63 (E.D.Mo.1992), a case of sexual abuse of two minors by a volunteer basketball coach at a school operated by the St. Louis Archdiocese. Although the *May* court accepted the first encounter doctrine enunciated in *Interstate,* the parties did not appear to contest this doctrine. *See id.* at 65 ("The parties seem to agree that the so-called 'first encounter' theory of coverage applies."). Because the *May* court provided no analysis for applying this doctrine, we do not rely on that case in deciding the issue.

Of course, none of the above cases cites decisions of Rhode Island courts. However, Underwriters also relies on *Bartholomew v.* *Insurance Co. of North America,* 502 F.Supp. 246 (D.R.I.1980), *aff'd sub. nom. Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27 (1st Cir.1981). *Bartholomew* involved a defective automatic carwasher apparatus. The issue facing the district court was whether the continuing damage caused by the defective apparatus constituted one or multiple occurrences.

The *Bartholomew* court acknowledged that it could find no Rhode Island cases discussing this issue. The court, however, concluded that Rhode Island would follow the majority view, the cause theory. *Id.* at 251–252. Having adopted this theory, the court found that the cause of the injury was the defectively designed and constructed carwash apparatus.[10] *Id.* at 252. The *Bartholomew* court went on to hold that, under Rhode Island law,[11] the time of the single occurrence was when the plaintiff actually was damaged, not when the defendant committed the wrongful act.[12] *Id.* Although only holdings of the Rhode Island Supreme Court are binding on this court in this case, *Bartholomew* is the only case that gives any indication on how the Supreme Court would interpret the provisions of the insurance policy at issue.

Interstate, on the other hand, cites *Diocese of Winona v. Interstate Fire and Casualty Co.,* Civil File Nos. 3–90–0441, 3–90–0527 (D.Minn. July 23, 1992). The facts in *Diocese of Winona* are similar to the instant case, a priest sexually abusing a boy over a period of time. Unlike the line of cause theory cases cited by Underwriters, the *Diocese of Winona* court, applying Minnesota law, followed the actual injury rule, citing *Industrial Steel Container v. Fireman's Fund,* 399 N.W.2d 156, 159 (Minn.App.

**9.** The parties in *Interstate* agreed that the child's injuries happened at the time he was first molested by the priest. *See Interstate,* 747 F.Supp. at 625.

**10.** The court acknowledged that even under the minority "effect theory", it would have found a single occurrence because the failure of the apparatus was not a distinct event but a continual degradation in performance. *Bartholomew,* 502 F.Supp. at 252. The appellate court did not discuss the issue of one occurrence vs. multiple

occurrences. *See Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27, 28 (1st Cir.1981).

**11.** The court again acknowledged that no Rhode Island law existed on this issue. *Bartholomew,* 502 F.Supp. at 250.

**12.** The appellate court specifically discussed this issue and agreed with the district court. *See Bartholomew,* 655 F.2d at 28.

1987).[13]  *See Diocese of Winona,* slip op. at 8–10.  The *Diocese of Winona* plaintiffs attempted to distinguish *Industrial Steel* as a property damage case, where it is difficult to determine when the damage occurs, rather than a personal injury case, where all the damage occurs at one time.  The court, however, rejected the assumption in *Interstate, Diocese of Lafayette,* and *May,* that all damage in sexual abuse cases occurs at the time of the first encounter.  *Id.* at 10–11.

Clearly, there are two opposing theories. What matters, however, is the explicit language of the insurance contract which states that the "continuous or repeated exposure ... results in personal injury."  Thus, we must find that John Doe suffered personal injury during the policy period.  While we agree with the *Winona* court that not all damage occurred at the time of the first encounter with Father O'Connell, we do not believe this fact requires a conclusion of more than one occurrence under the facts of this case.  The *Winona* court applied the rule stated in *Industrial Steel,* a case involving property damage due to long-term release of hazardous wastes, to a sexual abuse case.  However, we do not believe that such an extension is appropriate.  As the *Industrial Steel* court stated: "It is difficult in long-term exposure cases to determine whether there was property damage occurring during a specific policy period."  *Industrial Steel,* 399 N.W.2d at 159.

We do not face this question in this case. Interstate does not deny that John Doe suffered˙ some injury at the time of the first encounter.[14]  Thus, the policy behind *Industrial Steel* and similar hazardous materials cases, and upon which the *Winona* court relied, is not present here.  Looking at the contract language, this court believes that the interpretation of similar contract language by the *Interstate* court and its progeny is the reasonable interpretation—that the

continuing actions of Father O'Connell and the continuous negligence of the Diocese were the cause of John Doe's injuries and thus constitute one occurrence.  Based on this reasoning, we believe that the Rhode Island Supreme Court would find that the negligent supervision on the part of Diocese officials and the acts of Father O'Connell constitute one occurrence under the terms of the insurance policies.

### B.  *Did the Abuse Occurring at Two Separate Locations Constitute Two Occurrences?*

Interstate also argues that because Father O'Connell molested John Doe at two separate locations, Bristol and South Kingston, Rhode Island, we must find such actions to constitute two occurrences under the language of the insurance policy.  Interstate further argues that we must consider the multiple locations of assault and battery by Father O'Connell.[15]

The critical language of the policies states: "All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence."

#### 1.  *Actions of the Diocese*

■ Citing *Transport Insurance Co. v. Lee Way Motor Freight, Inc.,* 487 F.Supp. 1325 (N.D.Tex.1980), Underwriters contend that Father O'Connell's conduct constitutes but one occurrence under the policy language.  *Transport Insurance* concerned an insurance dispute of a company found to have engaged in a pattern of racial discrimination at four separate locations.  *Id.* at 1326. Even though the discrimination occurred at four different locations, the *Transport Insurance* court found that the discrimination was due to a companywide policy emanating from the corporate headquarters in Oklahoma City.  *Id.* at 1329.  Based on similar lan-

---

**13.**  Under Minnesota law, the time of any occurrence is the time of actual damage, not the time of the wrongful act.  *Singsaas v. Diederich,* 238 N.W.2d 878, 880 (Minn.1976).  This appears to be the same as the *Bartholomew* court's interpretation of Rhode Island law.  *See supra* text accompanying note 9.

**14.**  Interstate does argue that not all of John Doe's injuries occurred at that time, however.

**15.**  Count I of the amended complaint seeks recovery from Father O'Connell for assault and battery and intentional infliction of emotional distress.

guage in the policies at issue,[16] the actions or inactions of the Diocese and its officials all took place at one location, Providence.

### 2. *Actions of Father O'Connell*

Interstate appears to argue that the abuse of John Doe by Father O'Connell at two separate locations constitutes two occurrences, separate and distinct from whether the Diocese's failure to supervise Father O'Connell constitutes two occurrences.[17] Although Underwriters never addressed this issue,[18] it is clear to the court that the actions of Father O'Connell did not emanate from the same location. From the evidence, there is no factual dispute that the sexual abuse occurred in two places: the rectory of the Diocese in Bristol and at Father O'Connell's summer cottage in South Kingston.[19] Father O'Connell's first sexual encounter with John Doe was at the cottage in July 1983.

Father O'Connell was an insured under the policies at issue. *See* Def. Rule 12(M) Statement of Undisputed Facts, ¶ 4. The settlement released and discharged Father O'Connell in addition to the other defendants to the underlying sexual abuse action for *inter alia,* "claims for bodily and personal injuries ... which may have resulted or may result from the alleged acts or omission of Reverend William C. O'Connell...." There seems no question to this court that Father O'Connell's actions subjected him to liability separate from the liability of Diocese officials for failure to supervise and that the parties released Father O'Connell from liability as part of the settlement. A plain reading of the insurance policies states that acts occurring at one location are one occurrence. This suggests to this court that Father O'Connell's sexual abuse of John Doe constitutes two occurrences.

The court is reluctant, however, to issue a definitive ruling on this issue at this time. As we stated *supra,* Underwriters did not address this issue in their reply brief. We also noted that Interstate's framing of the issue was less than clear. Although we are called on to decide one case, we are aware that this issue of first impression could have an impact on other cases. The effect on insurance companies and on insured Archdioceses and Dioceses of acts of sexual abuse by priests will continue in the future. Consequently, we believe it is best to postpone deciding this issue until we are convinced that the parties clearly understand the issue and advocate their respective positions. We therefore order the defendant to submit additional arguments within 30 days on the question of whether Father O'Connell's own actions at Bristol and South Kingston constitute two occurrences under the insurance policies.

### CONCLUSION

For the reasons stated above, we conclude that Father O'Connell's actions in the two policy periods do not constitute two occurrences, and that his abuse of John Doe in two locations in one policy period constitutes one occurrence for the purposes of the failure to supervise claim. We decline to decide at this time the question of whether Father O'Connell's own actions in two locations constitutes two occurrences under the insurance policies and we order further briefing on this issue. Consequently, we deny plaintiffs' motion for summary judgment and deny defendant's cross-motion for summary judgment.

---

**16.** The language in the *Transport Insurance* policy refers to "one premises location" as opposed to "one location" in the policies in this case.

**17.** See Def.'s Cross–Mot. for Summ. J., ¶ 12; Def.'s Mem. in Support of Def.'s Cross–Mot. for Summ. J. at 14 ("the priest's ability to exploit his position and the DIOCESE's opportunity to supervise, discipline or control the priest's activities varies dependent upon the different involved locations").

**18.** See Pls.' Reply to Mot. for Summ. J. at 10–12. While Interstate's arguments are less than clear, it appears to the court that Underwriters had sufficient notice that Father O'Connell's own conduct could constitute multiple occurrences.

**19.** Underwriters never suggest that under the contract Bristol and South Kingston are one location. *Cf.* Pls.' Reply to Their Mot. for Summ. J. at 11 ("Fr. O'Connell's decision to continue molestations in another location is irrelevant.").